**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN: 249203)
ak@kazlg.com
Nicholas R. Barthel, Esq. (SBN: 319105)
nicholas@kazlg.com
245 Fischer Avenue, Ste. D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523
[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA VALDEZ,<br>JENNIFER ENCINAS,<br>MARCIE GAWRONSKI,<br>AMY LaGIOIA and<br>KERRY ANDERSEN DOUMITE<br>individually and on behalf of all<br>others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>ALLERGAN, INC.<br>f/k/a INAMED CORPORATION,<br>ALLERGAN USA, INC. and<br>ALLERGAN plc.,<br><br>            Defendants. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR:**<br>**(1) Strict Liability Failure to Warn**<br>**(2) Negligence**<br>**(3) Fraudulent Concealment**<br>**(4) Unjust Enrichment**<br>**(5) Medical Monitoring**<br><br>JURY TRIAL DEMANDED |

    Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, based on information and belief, and for causes of action against

Defendants ALLERGAN, INC. (f/k/a INAMED CORPORATION), ALLERGAN USA, INC. and ALLERGAN plc (hereinafter, collectively referred to as "Defendants" or "Allergan"), hereby allege as follows:

## NATURE OF THE ACTION

1. Defendant ALLERGAN INC. and Defendant ALLERGAN USA, INC. are wholly owned subsidiaries of Defendant ALLERGAN plc ("Defendants"), who manufactures and sells BIOCELL saline-filled and silicone-filled breast implants and tissue expanders.

2. On July 24, 2019, Defendants issued a worldwide recall of their BIOCELL textured breast implants and tissue expanders. (*See* Exhibit A, Allergan Recall Notice and Exhibit B, U.S. Affected Products List.) The FDA categorized the Defendants' action as a "Class I Recall", which is defined as "a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death."

3. Recall is a method of removing or correcting products that are in violation of laws administered by the Food and Drug Administration ("FDA"). The Defendants' recall followed the FDA's update of their safety information which found a higher incidence of anaplastic large cell lymphoma ("BIA-ALCL") in patients who have textured breast implants.

4. BIA-ALCL is a type of non-Hodgkin's lymphoma (cancer of the immune system). In most cases, BIA-ALCL is found in the scar tissue and fluid near the implant; but in some cases it can spread through the body.

5. BIA-ALCL symptoms include lumps, swelling in the breast, asymmetry around the breast implant, and pain around the breast implant. The recommended diagnostic testing for BIA-ALCL is invasive and includes ultrasound evaluation for fluid collection, breast masses, and enlarged regional lymph nodes and, in some cases, explant of the implant and surrounding scar tissue. A suspicious mass requires tissue biopsy and evaluation.

6. BIA-ALCL treatment includes removal of the implant and in some patients may also require treatment with chemotherapy and radiation treatment.

7. Defendants benefited from their products by testing BIOCELL implants starting in 1998 in order to obtain market approval from the FDA in May 2000 (saline-filled) and November 2006 (silicone-filled) through July 24, 2019, at the expense of Plaintiffs and the Class (as defined below) who are exposed to an elevated risk of developing BIA-ALCL.

8. Plaintiffs bring this action individually and on behalf of others in the United States who have recalled BIOCELL textured implants and BIOCELL tissue expanders. They seek relief for damages they suffered due to Defendants' misconduct.

9. Plaintiffs and the Class will be forced to expend substantial sums for the removal of the recalled implants, surgical and diagnostic fees, and/or medical monitoring and invasive diagnostic procedures required as a result of their exposure to the risk of contracting BIA-ALCL. Plaintiffs seek relief individually and for the Class to remedy the harms from Defendants' sale of recalled BIOCELL products to Plaintiffs and the Class.

## **DEFENDANTS**

10. Defendant ALLERGAN plc is a publicly traded corporation whose headquarters is in Dublin, Republic of Ireland. Allergan plc's administrative headquarters in the United States are located in the states of New Jersey and California.

11. Defendant ALLERGAN, INC., formerly known as INAMED CORPORATION ("Inamed"), and prior to that known as MCGHAN MEDICAL CORPORATION ("McGhan"), is a wholly-owned subsidiary of Allergan plc and is incorporated under the laws of Delaware with its principal place of business in New Jersey.

12. Defendant ALLERGAN USA, INC. is a wholly-owned subsidiary of Allergan plc and is incorporated under the laws of Delaware with its principal place of business in New Jersey.

13. At all relevant times, Defendant ALLERGAN, plc, Defendant ALLERGAN INC., and Defendant ALLERGAN USA, INC., and their predecessors Inamed

Corporation a/k/a Inamed Medical Products Corporation, and McGhan Medical Corporation, acted in all aspects as the agent and alter ego of one another.

## PLAINTIFFS AND THEIR SPECIFIC ALLEGATIONS

### A. Plaintiff "J.V."

14. At all times relevant to this action, Plaintiff JESSICA VALDEZ, (Plaintiff "J.V.") was domiciled within and was a citizen of Orange County, California, within the Southern Division of the Central District of California. As of the time of filing this action, Plaintiff J.V. resides in Okinawa, Japan, where her husband is stationed in the military. Despite her temporary relocation, Plaintiff J.V. remains a citizen of the State of California.

15. On May 17, 2019, Plaintiff J.V. underwent an implant revision and implanted Natrelle 140 Highly Cohesive Anatomically Shaped Silicone-Filled Breast Implants, reference number TRM-560. The last four digits of her left implant serial Number are 4957. The last four digits of her right implant serial number are 0616.

16. Plaintiff J.V. paid out-of-pocket a total of $6,350 for her May 17, 2019, surgery.

17. Plaintiff J.V.'s plastic surgery center is in San Juan Capistrano, California, which is within the Southern Division of the Central District of California.

18. On the day of her surgery, Plaintiff J.V. received a Device Tracking document to be sent to Allergan at P.O. Box 51470, Ontario, California 91761.

19. Plaintiff's style was subject to the July 24, 2019, worldwide recall due to the risk of it causing BIA-ALCL.

20. Because Plaintiff J.V. has an increased risk of developing BIA-ALCL, she seeks to have Defendants pay for the removal of her implants and to pay for proper testing on her capsule, while not having to agree to release Defendants from liability due to her need for medical monitoring.

### B. Plaintiff "J.E."

21. Plaintiff JENNIFER ENCINAS ("Plaintiff J.E.") is domiciled within and is a citizen of San Diego, California.

22. On June 24, 2016, Plaintiff J.E. was implanted with Natrelle 140 Highly Cohesive Anatomically Shaped Silicone-Filled Breast Implants, reference number FX-410775. The last four digits of her left implant serial Number are 6723. The last four digits of her right implant serial number are 6720. Plaintiff J.E. paid $7,500 for her implants.

23. Plaintiff J.E.'s Style was subject to the July 24, 2019, worldwide recall due to the risk of it causing BIA-ALCL. Plaintiff was notified of the recall by the Defendants on August 9, 2019.

24. Plaintiff J.E. suffers from bilateral "non-stop itching" and "deep pains around the sides of her breasts" and reported as much to the Defendants in August 2019.

25. Upon information and belief, a representative of Defendants contacted Plaintiff J.E.'s plastic surgeon and recommended the surgeon not explant the device.

26. Plaintiff J.E.'s health insurance provider became aware of the reported symptoms and agreed to pay for explant with an out-of-network plastic surgeon.

27. Because Plaintiff J.E. has an increased risk of developing BIA-ALCL, she seeks to have Defendants pay for the removal of her implants and to pay for proper testing on her capsule, while not having to agree to release Defendants from liability due to her need for medical monitoring.

C.  **Plaintiff "M.G."**

28. Plaintiff MARCI GAWRONSKI ("Plaintiff M.G.") is domiciled within and is a citizen of Erie County, New York.

29. In March 29, 2018, Plaintiff M.G. was implanted with Natrelle Saline-Filled Breast Implants, Reference Number 168-300.  The last four digits of her left breast serial number are 7810. The last four digits of her right breast serial number are 9272.

30. On the day of her surgery, Plaintiff M.G. received a Device Tracking card with the address of 2525 Dupont Drive, Irvine, California 92612.

31. Plaintiff M.G.'s BIOCELL implant Style was subject to the July 24, 2019, worldwide recall due to the risk of it causing BIA-ALCL.

32. Plaintiff M.G. suffers from extreme pain and constant burning, near her right breast implant.

33. Plaintiff M.G. was quoted $7,200 for explant surgery.

34. Because Plaintiff M.G. has an increased risk of developing BIA-ALCL, she seeks to have Defendants pay for the removal of her implants and to pay for proper testing on her capsule, while not having to agree to release Defendants from liability due to her need for medical monitoring.

**D.** **Plaintiff "A.L"**

35. Plaintiff AMY LaGIOIA ("Plaintiff A.L.") is domiciled within and is a citizen of DuPage County, Illinois.

36. On September 18, 2007, Plaintiff A.L., underwent revision surgery, was implanted with Inamed Silicone-Filled Breast Implants, Reference Number 120-400. The last four digits of her left breast serial number are 6194. The last four digits of her right breast serial number are 2583.

37. Plaintiff A.L.'s style was subject to the July 24, 2019, worldwide recall due to the risk of it causing BIA-ALCL.

38. Plaintiff A.L. suffers severe pain in the right breast and swelling.

39. Because Plaintiff A.L., has an increased risk of developing BIA-ALCL, she seeks to have Defendants pay for the removal of her implants and to pay for proper testing on her capsule, while not having to agree to release Defendants from liability due to her need for medical monitoring.

**E.** **Plaintiff "K.A."**

40. Plaintiff KERRY ANDERSEN DOUMITE, ("Plaintiff K.A.") is domiciled within and is a citizen of Calcasieu Parish, Louisiana.

41. In 2012, Plaintiff K.A. was diagnosed with breast cancer. In the course of her cancer treatment, she underwent a double mastectomy and was implanted with Mentor Contour (smooth) implants on both sides.

42. By 2015, the right-side implant migrated so Plaintiff K.A. underwent a revision surgery and was implanted Natrelle 410 Textured Silicone Breast Implant on her right side, reference Number FF-410740.  The last four digits of her right breast serial number are 2318.

43. Plaintiff K.A.'s right-side implant Style was subject to the July 24, 2019, worldwide recall due to the risk of it causing BIA-ALCL. Plaintiff was notified of the recall by her plastic surgeon's office in September 2019.

44. Plaintiff K.A.'s symptoms include extreme pain on her right-side near her breast requiring an explant surgery. Her plastic surgeon is out-of-network and located across the state.

45. Because Plaintiff K.A. has an increased risk of developing BIA-ALCL, she seeks to have Defendants pay for the removal of her implants and to pay for proper testing on her capsule, while not having to agree to release Defendants from liability due to her need for medical monitoring.

## JURISDICTION AND VENUE

46. **Subject Matter Jurisdiction.** This action is a "class action" as defined by the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(1)(B), as it is filed under rule 23 of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction because: (1) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) members of the Class, including named Plaintiffs, are citizens of states different than one or more Defendants; and (3) members of the Class, including named Plaintiffs, are citizens of a state and at least one of the Defendants—ALLERGAN, plc—is a citizen or subject of a foreign state.

47. **Personal Jurisdiction.** This Court has general personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of doing business within the state, including within this District; have had continuous and systematic general business contacts within the state, including within this District; and Defendants can be said to have reasonably anticipated being haled into court in this

forum. This Court has specific personal jurisdiction over Defendants because this action arises out of and relates to Defendants' contacts within this forum. Defendants are and were at all relevant times residents of and/or authorized to conduct business in the State of California and Defendants conducted such business within California including the performance of acts that caused or contributed to the harm giving rise to this action. Defendants knowingly directed the products through the stream of commerce into this District. Defendants have advertised and marketed within this District through the use of sales representatives, through the wires and mails, and via e-commerce directed into this District. Defendants knowingly direct electronic activity into this District with to facilitate business interactions, including sale and promotion of the devices described herein, all of which resulted in harms suffered by Plaintiff J.V. and other Class members within this District.

48. More specifically, Defendants received substantial financial benefit and profits as a result of the designing, formulating, testing, packaging, labeling, producing, creating, constructing, making, assembling, advertising, clinical testing, marketing, promoting, distributing, manufacturing, and selling the Product in California, and in the Southern Division of the Central District of California at the time of the BIOCELL recall.

a. Defendants entered the breast implant market with McGhan in California in 1985, and then marketed and sold its BIOCELL products to Members of the Class within California and then throughout the United States.

b. McGhan Medical Corporation registered their trademark for BIOCELL in June 1997. This trademark is last listed under Allergan, Inc. 2525 Dupont Drive Irvine, California.

c. The Directions for Use containing product and patient information for the BIOCELL products were drafted, reviewed, and ultimately submitted to the FDA for approval in Santa Barbara and/or Irvine, California.

d.  Defendants' division responsible for its BIOCELL breast implants and
for overseeing the recall—including the deficient replacement
warranty—is based in Irvine, California.

e.  Plaintiffs and Members of the Class have received marketing
materials, pamphlets, medical device tracking documents, and
communications, including the recall notice from the Defendants out
their offices located in California.

f.  Defendants' Irvine, California location is listed on the FDA's website
as the Class I recalling firm's address.

49.  At all times material hereto, the action arises from obligations that arise out of, or are connected with, Defendants' activities within the State of California.

50.  Plaintiffs' and the Class members' claims arise out of and/or are related to Defendants' California-related forum activities.

51.  **Venue.** Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred within the Central District of California, Plaintiff J.V. and other Class members were implanted within this District and suffered injury here. Venue also is proper pursuant to 28 U.S.C. §1391(c)(2) because this Court maintains personal jurisdiction over Defendants.

## FACTUAL ALLEGATIONS

### A.  The Science of Breast Implants and Tissue Expanders

52.  Breast implants are prosthesis medical devices that are implanted under the breast tissue or under the chest muscle to increase (augment) breast size, change the contour of the breast, or to rebuild (reconstruct) breast tissue after mastectomy or other damage to the breast.

53.  There are two types of breast implants approved for sale in the United states: sterile saltwater ("saline") or silicone-gel filled. Both have a silicone outer shell.

54. "Silicone" refers to a group of polymers based on the element silicon. Silicone polymers may be produced in a variety of forms, including oil, gels, or elastomers (rubber). Being purely synthetic, silicones do not exist in nature. There are three general types of breast implant products, defined by their filler material: saline solution, silicone gel, and composite filler. Breast implants are available in various sizes and can have either a smooth or textured shell.

55. A breast tissue expander is a temporary device that can be inflated with saline to stretch the tissue at the mastectomy site to create a new tissue (a tissue flap) for implantation of the breast implant. A tissue flap is a combination of skin, fat, and/or muscle that is moved from the patient's stomach, back, or other area the body to the chest area, and shaped into a new breast. Tissue expanders should be removed once adequate tissue has developed and are not to be used beyond 6 months.

56. Breast implant and tissue expander manufacturers utilize various and, at times proprietary, techniques to texture the surface of their implants. The "lost-salt" technique is utilized by the Defendants to create their BIOCELL products. The BIOCELL shell is created by dipping the implant into uncured silicone, but before the surface dries, it is pressed into a bed of fine, granular salt and then cured in a laminar flow oven to create an irregular pattern of surface pores. BIOCELL implants and tissue expanders were designed to produce overhangs at the opening of the pores to promote greater tissue adherence.

57. This case is about the increased risk of developing BIA-ALCL for women who have had BIOCELL textured implant and/or tissue expanders.

B. **BIOCELL Textured Implants' FDA Premarket Approval Application Process**

58. The FDA is responsible for protecting the public health by ensuring the safety, efficacy, and security of medical devices. The Medical Device Amendments of 1976 of the Federal Food, Drug and Cosmetic Act ("FFDCA") created a three-class, risk-based classification system for all medical devices.

59. At all times relevant, the FDA classified breast implants as Class III devices.

60. Class III devices pose the greatest risk to human safety and therefore require FDA premarket approval ("PMA") under 21 C.F.R. § 814 before marketing the product to the public.

61. A PMA application must contain certain information that is critical to the FDA's evaluation of the medical device including "an identification, discussion, and analysis of any other data, information, or report relevant to an evaluation of the safety and effectiveness of the device known to or that should reasonably be known to the applicant from any source, foreign or domestic, including information derived from investigations other than those proposed in the application and from commercial marketing experience." 21 C.F.R. § 814.20 (8)(ii).

62. After the FDA approves a device, the FDA-required labeling sets forth the conditions of use under which the product has been shown to meet the relevant standard for marketing. The definition of labeling extends to posters, tags, pamphlets, circulars, booklets, brochures, instruction books, Directions for Use ("DFU"), and fillers.

63. In January 1992, because of safety and efficacy concerns, the FDA announced a voluntary moratorium on silicone gel-filled breast implants. The FDA requested manufacturers to stop supplying them and requested surgeons to stop implanting them while the FDA engaged in a further review of the implant devices.

64. In April 1992, the FDA entered into an agreement with McGhan setting forth the requirements for McGhan to conduct and submit data for their clinical trials of the silicone implant devices for use in reconstruction patients.

65. In March 1998, the FDA approved McGhan's study protocol, which allowed the manufacturer to begin enrolling patients in the study. This study was referred to as the "Adjunct Study" and it involved reconstruction patients. McGhan was to take all reasonable steps to ensure that it received informed consent from all patients before implantation of any device on a form consistent with that which had previously been

approved by the FDA, and McGhan was to make sure all product labeling was consistent with the agreement and the terms of the approved protocols.

66. Also in 1998, the FDA approved McGhan's investigational device exemption ("IDE") for use of the same devices for breast augmentation. This study was referred to as the "CORE" study. It involved breast reconstruction, and revision (revision-augmentation and revision-reconstruction) patients. McGhan was to take all reasonable steps to ensure that it received informed consent from all patients before implantation of any device on a form consistent with that which had previously been approved by the FDA, and McGhan was to ensure that all product labeling was consistent with the agreement and the terms of the approved protocols. Patient follow-up was to be at 0-4 weeks, 6 months 12 months, 24 months, and annually through 10 years.

67. As the Adjunct and CORE studies progressed, the FDA continued its oversight and considered material submitted about the adjunct and CORE studies submitted by McGhan each year.

68. In late 1999–early 2000, the Advisory Panel on General and Plastic Surgery reviewed implant PMAs. This panel met in open session on March 1–3, 2000, where the general consensus was that patient labeling should include as much information as possible to address all possible risks and complications with information on expected outcomes and that the information should be focused on product-specific data.

69. On May 10, 2000, the FDA announced that it had approved McGhan's PMA for BIOCELL textured shell surfaced saline-filled breast implants for augmentation in women age 18 and older and for reconstruction in women of any age application, including Styles 163, 168, 363 and 468.

70. As a condition of Defendant's PMA, and in order to provide continued reasonable assurance of the safety and effectiveness of the device, the Defendants were required to submit written report information concerning any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that was attributable to the device and (a)

had not been addressed by the devices' labeling or (b) had been addressed by the device's labeling, but occurred with unexpected severity or frequency. 21 C.F.R. § 814.82(a)(9).

71. According to the approval order, Defendants were required to report to the FDA information from any source that reasonably suggests that a device marketed by the Defendant may have caused or contributed to a death or serious injury; or has malfunctioned and such device or similar device marketed by the manufacturer or importer would be likely cause or contribute to a death or serious injury if the malfunction were to reoccur. (*See* Exhibit C, PMA 990074 Approval Order.)

72. In January 2002, McGhan, now known as Inamed Corporation, submitted to the FDA the first PMA for their silicone gel-filled breast implants.

73. On March 23, 2006, Allergan, Inc. completed its acquisition of Inamed Corporation, which expanded Allergan's global position as a premier specialty medical device company in high-growth markets such as the breast implant market.

74. In November 2006, Defendants' silicone-filled breast implants (under the brand name "Natrelle") received pre-market approval by the FDA under PMA number P020056.

75. In February 2013, Defendants' receive pre-market approval of the 410 Highly Cohesive Anatomically Shaped Silicone-Filled Breast Implants (also under the brand name "Natrelle") by the FDA under PMA number P040046.

76. As conditions of the 2006 and 2013 approvals, the FDA required Defendants to conduct six post-approval studies to characterize the long-term performance and safety of the devices. (*See* Exhibit D, PMA P020056 Approval Order and Exhibit E, PMA P040046 Approval Order.)

77. Defendants' failure to comply with the post-approval requirements constitutes a ground for withdrawal of PMAs P990074, P040046 and P020056 and the commercial distribution of a device that is not in compliance with conditions of the PMA is a violation of the FFDCA.

78. The primary responsibility for timely and accurately communicating complete, accurate, and current safety and efficacy information related to any medical device, including BIOCELL Breast Implants, rests with the PMA applicant manufacturer.

79. At all times relevant, and pursuant to 21 C.F.R. § 7.40(a), a PMA applicant manufacturer may voluntarily recall its product to carry out its responsibility to protect the public health and well-being from products that present a risk of injury or gross deception.

### C. BIOCELL Tissue Expanders' FDA 510(k) Clearance Process

80. BIOCELL tissue expanders do not go through the pre-market approval (PMA) process. Instead, they are "cleared" through the 510(k) process. A 510(k) application is a premarket notification made to FDA to demonstrate that the device to be marketed is substantially equivalent to a legally marketed device. 21 C.F.R. § 807.92(a)(3).

81. The 510(k)-clearance process does not independently assess the device for safety or effectiveness. Rather, the manufacturer is required only to demonstrate that the device is as safe and effective as ("substantially equivalent" to) a predicate 510(k) device, which itself need only have shown that it was as safe and effective as another predicate device, etc. Accordingly, a device that is both unsafe and ineffective can obtain 510(k) clearance so long as it is "as safe and effective" as a predicate device that was "as safe and effective" as another predicate device, and so on. Often the original or "root" predicate device that these copies of copies of copies are predicated upon is itself a device that pre-dated the 1976 Medical Device Amendments to the FFDCA and thus would not have been required to demonstrate safety or effectiveness, meaning that no device in the chain of predicates ever was determined to be safe and effective.

82. On January 5, 2011, Defendants' Natrelle 133 Tissue Expander with Suture Tabs— constructed from silicone elastomer and consisting of an expansion envelope with a BIOCELL textured surface—received 510(k) clearance by the FDA and was classified as a Class II device subject to special controls found at 21 C.F.R. § 878.3600 (73 Fed. Reg. 78242 (Dec. 22, 2008). (*See* Exhibit F, K102806 Clearance Letter.)  The device was

deemed substantially equivalent to the existing Natrelle Style 133 Series Tissue Expander Matrix, itself a 510(k) device that was recalled in July 2019(K862203).

83. On August 20, 2015, Defendants' Natrelle 133 Plus Tissue Expander received 510(k) clearance by the FDA as an unclassified device. (*See* Exhibit G, K143354 Clearance Letter.) The device was deemed substantially equivalent to the Mentor CPX 4 Breast Tissue Expander and CPX 4 Breast Tissue Expander with Suture Tabs, which are themselves 510(k) devices, (K130813), predicated on a previous Mentor 510(k) device that was cleared in 2001 (K011500).

84. 510(k) clearance for the Defendants' devices (K102806 and K143354), requires the Defendants to comply with the labeling and medical device reporting requirements of the FFDCA. 21 C.F.R.§ 801 and 21 C.F.R § 803.

85. The Medical Device Reporting (MDR) regulation 21 CFR Part 803 contains mandatory requirements for manufacturers, importers, and device user facilities to report certain device-related adverse events and product problems to the FDA, 510(k) devices.

### D. **BIOCELL and BIA-ALCL**

86. The first case of BIA-ALCL was reported in 1997 in association with implants. Keech JA Jr, Creech BJ. 1997. Anaplastic T-cell lymphoma in proximity to a saline-filled breast implant. Plast. Reconstr. Surg. 100, 554–555.

87. From 1998 (when Defendants started testing BIOCELL implants in women) through the date of Plaintiffs' and the Class members' implants, Defendants continually acquired new information regarding the strong association between its BIOCELL implants and the development of BIA-ALCL.

88. In November 2008, The Journal of the American Medical Association ("JAMA") published a retrospective analysis of 11 cases of ALCL between 1990 and 2006, suggesting "an association between silicone breast prostheses and ALCL…." de Jong D, Vasmel WL, de Boer JP, Verhave G, Barbe E, Casparie MK, van Leeuwen FE. 2008. Anaplastic large-cell lymphoma in women with breast implants. JAMA 300, 2030–2035. (10.1001/jama.2008.585).

89. In January 2011, the FDA released a report on BIA-ALCL. Its primary finding: "Based on the published case studies and epidemiological research, the FDA believes that there is a possible association between breast implants and ALCL." The FDA further noted that, while it was not prepared to associate a particular type of breast implant with BIA-ALCL, "ALCL has been found more frequently in association with breast implants having a textured outer shell rather than a smooth outer shell."

90. Later in 2011, the FDA formed an advisory committee meeting to discuss study limitations and to provide recommendations on how to better monitor the performance of these devices and how best to collect data on BIA-ALCL among patients with breast implants.

91. In February 2013, the DFU for PMA P040046, reported ALCL under an "other reported condition."

92. In July 2014, the United Kingdom's Medicines and Healthcare Products Regulatory Agency ("MHRA") issued a Medical Device Alert "to further encourage healthcare professionals to report cases of ALCL in women who have breast implants or who have had them removed."

93. In the same year, Scott Spear, M.D. and Diane Murphy, MBA, on behalf of the Defendants, followed up on their 6-year report with a 10-year study of the Natrelle Round Silicone Breast Implants and stated, "not much has changed in terms of safety information or health concerns." Their publication acknowledged a report of anaplastic large cell lymphoma because it was deemed peripherally related and relevant to the topic of safety information or health concerns. However, the authors concluded that the BIA-ALCL "topic is extraordinarily complex and outside the scope of this report but is a reminder of the wider context in which these data are presented. This 10-year prospective study was designed to acquire specific information and events that could be captured and interpreted in a study looking at 715 women. It was not designed for, nor could it be expected to provide, meaningful data on very rare events." Spear, S. and Murphy, D.

Natrelle Round Silicone Breast Implants: Core Study Results at 10 Years. Plast Reconstr Surg. 2014 Jun;133(6):1354-61. doi: 10.1097.

94. In March 2015, an independent, multi-state, multi-disciplinary analysis of 173 BIA-ALCL confirmed cases demonstrated that every affected woman had received a textured implant as some point in their clinical history. Epstein, AL, et al. Anaplastic large cell lymphoma occurring in women with breast implants: analysis of 173 cases. Plast Reconstr Surg. 2015 Mar; 135(3):695-705.

95. On May 19, 2016, the World Health Organization ("WHO") gave the disease an official designation as "BIA-ALCL" and classified it as a distinct clinical entity, separate from other categories of ALCL.

96. In November 2016, Australia's Therapeutic Goods Administration ("TGA"), which regulates medical devices in that country, convened an expert advisory panel to discuss the association between breast implants and ALCL and to provide ongoing advice. Following the advisory panel, the Joint Breast Implant-Associated ALCL Task Force analyzed all of the confirmed cases and concluded that higher-surface-area textured implants significantly increased the risk of breast implant-associated ALCL in Australia and New Zealand. Loch-Wilkinson A, et al, Breast Implant-Associated Anaplastic Large Cell Lymphoma in Australia and New Zealand: High-Surface-Area Textured Implants Are Associated with Increased Risk. Plast Reconstr Surg. 2017 Oct;140(4):645-654. The risk of ALCL was 14.11 times higher with Biocell textured implants compared with another manufacturer's textured implants. *Id*.

97. On March 21, 2017, the FDA released a safety communication updating the current understanding of BIA-ALCL. In the Updated Safety Alert, the FDA recognized the WHO's designation that BIA-ALCL can occur after receiving breast implants and stated that "[a]t this, time, most data suggest that BIA-ALCL occurs more frequently following implantation of breast implants with textured surfaces rather than those with smooth surfaces."

98. In May 2017, a global analysis of forty governmental databases identified 363 cases of BIA-ALCL with 258 being reported to the FDA. Srinivasa DR, et al. 2017. Global adverse event reports of breast implant associated ALCL: an international review of 40 government authority databases. Plast. Reconstr. Surg. 139, 1029–1039.

99. A September 2017 update from the FDA reported that the agency had received a total of 414 medical device reports ("MDRs") related to breast implants and ALCL, including nine deaths.

100. By September 2017, all of the Defendants' PMAs were supplemented with modifications to the language in the physician and patient labeling regarding the potential risk of breast implant associated anaplastic large cell lymphoma (BIA-ALCL). (*See* Exhibit H, Directions for Use Natrelle Physician Labeling at pp. 19-20.)

101. A 2018 JAMA Oncology article concluded that "[b]reast implants are associated with increased risk of breast-ALCL," but the absolute risk had not been determined. de Boer M, et al. 2018. Breast implants and the risk of anaplastic large-cell lymphoma in the breast. JAMA Oncol. 4, 335–341.

102. In March 2019, the FDA convened a General and Plastic Surgery Devices Panel to discuss, among other things, the risk of breast implants and tissues expanders related to BIA-ALCL. During this meeting, the Dr. Brown, the Vice President of Clinical Development for devices at Allergan explained to the Panel that "the etiology of BIA-ALCL is not fully understood, literature reports that higher impact surface area may increase the risk of BIA-ALCL." She hypothesized that biofilm (a thin, slimy film of bacteria that adheres to a surface) could be the cause of BIA-ALCL. Dr. Brown explained to the FDA panel that "during a procedure, bacteria can be introduced in the surgical environment. The higher surface area of a textured implant may increase the risk of bacteria accumulation. This bacterial contamination and biofilm may result in long-term inflammation." Meeting of the General and Plastic Surgery Devices Panel of the Medical Devices Advisory Committee (Mar. 25, 2019) (Statement of Dr. Stephanie M.

Brown). In the same presentation, Defendants explained the median time to onset for BIA-ALCL is approximately 8 years with a range of 2-25 years. *Id*.

103. On May 2, 2019, the FDA announced new steps aimed at helping to ensure that women have access to the information they need about breast implants. This included a change in how Defendants file medical device reports ("MDR") with the FDA. The FDA ended all Alternative Summary Reporting ("ASR") of breast implant medical device reports. The ASRs require less detail and are not publicly available through the FDA's Manufacturer and User Facility Device Experience ("MAUDE") website.

104. In June 2019, it was revealed to the public that nearly a half-million breast-implant files were contained in the FDA's ASR system. An analysis conducted by Madris Tomes—a former FDA public heath analyst and CEO of Device Events, which developed a web-based tool that searches medical device post-market surveillance data—found the additional 446,084 reports, which detailed a range of debilitating and painful complications, including breast implant ruptures and leaks, device migration and expulsion, and device incompatibility.

105. The ASR program was established to more efficiently review adverse events for well-established risks but was not allowed for patient deaths and unusual, unique or uncommon adverse events, which, in the case of Defendants' BIOCELL products, included BIA-ALCL. Therefore, summary reporting of BIA-ALCL would be inappropriate.

**E.    Defendants' Worldwide Recall of BIOCELL Breast Implants and Tissue Expanders and Subsequent BIOCELL Replacement Warranty Program**

106. On July 24, 2019, Defendants announced a voluntary worldwide withdrawal of unused stock of BIOCELL textured breast implants and tissue expanders from doctors' offices and hospitals, and a suspension of any future sales, which is part of the voluntary recall of BIOCELL textured breast implants and tissue expanders.

107. On July 30, 2019, Carrie Strom, Senior Vice President, U.S. Medical Aesthetics, sent a letter to "Allergan Plastic Surgery Customer[s]" outlining Defendants' BIOCELL

Replacement Warranty, which provides reimbursement for up to $1,000 in diagnostic fees and up to $7,500 in surgical fees. Defendants will not be providing surgical fee assistance to revision patients.

108. Upon information and belief, the BIOCELL Replacement Warranty is deemed consideration for release of Defendants' liability and it requests those opting into this program to forever discharge Defendants and any related persons and entities from all claims arising out of the use of their BIOCELL products.

109. Defendants' BIOCELL Replacement program, which started on July 24, 2019, will last only until July 24, 2021.

110. Patients who decide to keep their BIOCELL textured devices will continue to be covered under the NATRELLE ConfidencePlus Warranty, which includes reimbursement for up to $1,000 in diagnostic fees and up to $7,500 in surgical fees related to diagnosing and treating BIA-ALCL.

111. Upon information and belief, women who have a recalled implant beyond the ConfidencePlus 10-year warranty period are not offered reimbursement in diagnostic fees or in surgical fees related to diagnosis and treating BIA-ALCL.

112. Defendants' July 24, 2019, recall and July 30, 2019, BIOCELL replacement program do not mitigate the damages to Plaintiffs and the Class Members who have or had had BIOCELL devices in their bodies.

## PLAINTIFFS' CLASS ALLEGATIONS

113. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2)-(3) Plaintiffs J.V. J.E., M.G., A.L., and K.A., bring this action individually and on behalf of all others similarly situated, propose this straightforward definition for the Nationwide Class: **All women in the United States who have implanted BIOCELL Textured Breast Implants and/or BIOCELL Tissue Expanders that were voluntarily recalled by Defendants on July 24, 2019**.

114. The rights of each Class member were violated in similar fashion based upon Defendants' uniform actions. Plaintiffs' Nationwide Class is comprised of a finite and

ascertainable group of consumers whom the Court can easily contact for purposes of class certification.

115. This action has been brought and may be properly maintained as a class action for the following reasons:

    a. **Numerosity (FRCP 23(a)(1))**: The number of prospective Class members is so large that it is impractical to bring them all before the Court. Plaintiffs anticipate thousands if not tens of thousands of Class members based on the following:

        1. The McGhan Medical Corporation began clinical trials of their      BIOCELL implants in 1998. The BIOCELL implants are all subject to the voluntary recall of July 24, 2019.

        2. The FDA Class I recall notice of September 11, 2019, defines the "Quality in Commerce" as: 4,026,287 Breast Implants and Tissue Expanders combined in total.

    b. **Commonality (FRCP 23(a)(2))**: Common questions of law and fact affect all Class members and predominate over questions involving individuals. These common legal and factual questions include, without limitation:

        1. Whether Defendants failed to warn consumers regarding the risks of the BIOCELL recalled products;

        2. Whether Defendants failed to ensure its BIOCELL labeling was not misbranded;

        3. Whether Defendants were negligent in the manufacturing of their BIOCELL recalled products;

        4. Whether Defendants were negligent in the design and post-market surveillance of their BIOCELL recalled products;

        5. Whether Defendants fraudulently concealed the risk of BIOCELL in association with BIA-ALCL;

6. Whether Defendants were unjustly enriched by the sale of BIOCELL recalled products;

7. The mechanism through which Defendants will conduct medical monitoring for Plaintiffs and the Class;

8. The appropriate nature of class-wide equitable relief; and

9. The appropriate measure of restitution and/or damages to Plaintiffs and the Class.

c. **Typicality (FRCP 23(a)(3))**: The representative parties' claims are typical of the claims of the Class members because Defendants harmed all Class members through a uniform course of conduct, all Class members suffered the same or materially similar injury, all seek the same relief, and all are in need of medical monitoring for BIA-ALCL. There are no defenses that Defendants may assert against some, but not all members. Class action treatment in no way impairs Defendant's ability to defend any given Class member's claim.

d. **Adequacy (FRCP 23(a)(4))**: Plaintiffs are fair and adequate representatives of the Class because their interests do not conflict with the Class members' interests; because Plaintiffs will prosecute this action vigorously and are highly motivated to seek redress against Defendants. Plaintiffs have selected competent counsel who are experienced in class litigation and have the resources to pursue this action efficiently and effectively.

e. **Superiority (FRCP 23(b))**: Class action treatment is the superior method for adjudicating this controversy because questions of law or fact common to the class members predominate over any question affecting only individual members. While each Class member suffered damages of consequence, their damages are small compared to the burden and expense of individually prosecuting the complex and

extensive litigation required to redress their harms. Individualized litigation would needlessly increase delay and expense for all parties involved. By contrast, a class action presents fewer management difficulties, allows the redress of claims that might otherwise go unaddressed, and provides the benefits of single adjudication while avoiding inconsistent adjudications of similar claims and issues.

116. Pursuant to Federal Rules of Civil Procedure 23(c)(4), the class also may be divided into particular issues determining:

a. Whether the Defendants knew or should have known the risk of developing BIA-ALCL that their BIOCELL products created;

b. Whether Defendants failed to establish and maintain procedures to prevent contamination of their product by biofilm substances;

c. Whether Defendants knew or should have known the BIOCELL design made Plaintiffs and Class Members susceptible or predisposed to BIA-ALCL.

117. Pursuant to Federal Rules of Civil Procedure 23(c)(5), the class may also be divided into subclasses, including the following:

a. **California Subclass**: All women in the State of California who have implanted BIOCELL Textured Breast Implants and/or BIOCELL Tissue Expanders that were voluntarily recalled by Defendants on July 24, 2019.

b. **New York Subclass**: All women in the State of New York who have implanted BIOCELL Textured Breast Implants and/or BIOCELL Tissue Expanders that were voluntarily recalled by Defendants on July 24, 2019.

c. **Illinois Subclass**: All women in the State of Illinois who have implanted BIOCELL Textured Breast Implants and/or BIOCELL

Tissue Expanders that were voluntarily recalled by Defendants on July 24, 2019.

    d. **Louisiana Subclass**: All women in the State of Louisiana who have implanted BIOCELL Textured Breast Implants and/or BIOCELL Tissue Expanders that were voluntarily recalled by Defendants on July 24, 2019.

118. Plaintiffs reserve the right to add Class Representatives from each of the 50 states if the Court deems state-by-state subclasses necessary and appropriate.

119. Pursuant to Federal Rules of Civil Procedure 23(g), the undersigned Counsel requests appointment as class counsel.

## CAUSES OF ACTION

## COUNT I — STRICT LIABILITY FAILURE TO WARN

### On Behalf of the Class

120. Plaintiffs and the Class incorporate by reference all preceding paragraphs.

121. Defendants supplied to the Plaintiffs and the Class documents including the DFU, Patient Labeling, Brochures, Device Tracking Forms, and/or Warranty documents concerning their BIOCELL products.

122. Plaintiffs, the Class, and the plastic surgeons who treated them had access to data concerning adverse events from the MAUDE database and Defendants' published studies

123. State law requires Defendants' labeling to relay Defendants' actual knowledge of the clear causal connection between its BIOCELL implants and BIA-ALCL, an association that was significantly greater than the risk posed by other manufacturers' breast implants. State law does not impose duties materially different from 21 C.F.R. § 814.39(d)(1)-(2). Beginning in 1998, Defendants acquired and continued to acquire new information regarding the true risks with BIOCELL implants. Defendants knew the causal connection between their textured implants and BIA-ALCL before Plaintiffs or the Class had the BIOCELL product implanted.

124. Defendants obtained this information from a variety of sources: (1) their own clinical studies; (2) internal data concerning adverse event reports that was subsequently submitted as ASRs, rather than publicly available MDRs; (3) published reports/case studies; (4) literature concerning the safety and efficacy of their BIOCELL Products; (5) FDA and foreign regulatory communications; and (6) complaints from the Class and/or their healthcare providers.

125. The DFU, Patient Labeling, Brochures, Device Tracking Forms, Warranty documents and Defendants' published literature lacked information concerning what the Defendants' knew about BIA-ALCL.

126. State law requires Defendants to disclose known risks to Plaintiffs and their physicians. The law does not impose duties materially different from 21 C.F.R. § 803.50. Despite the 2011 call from the FDA to determine how to identify safety signals that would better identify health risks associated with the breast implants, Defendants chose to submit ASRs until they were banned rather than report by way of MDRs, which would have been publicly available. Defendants' failure to submit MDRs made their warning inadequate and accordingly rendered the implants defective.

127. All state laws require Defendants to warn physicians so as long as the product was in use in the Plaintiffs and the Class. The law does not impose duties materially different from 21 C.F.R § 7.40(a), where a PMA or 510(k) applicant manufacturers carry out the responsibility to protect the public health and well-being from products that represent a risk of injury or gross deception or are otherwise defective. Defendants' recall fails to carry out their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception, rather it serves as a tool to limit their liability.

128. Plaintiffs and the Class have the increased risk of developing BIA-ALCL when the BIOCELL breast implant and/or tissue expanders are used or misused in a foreseeable way.

129. Due to the inadequate warning, Plaintiffs and the Class are at an increased risk of developing BIA-ALCL, which presents a substantial danger to them.

130. Plaintiffs and the Class and their plastic surgeons relied on Defendants' labeling and made their decision to use the BIOCELL device based on the information in the label. Had Defendants complied with their duties owed to the Plaintiffs, Plaintiffs would have decided against the textured implant, and Plaintiffs would not be at an increased risk of developing BIA-ALCL.

131. Defendants' misconduct was a proximate cause of Plaintiffs' and the Class members' damages in the form of surgical costs of removal of the products and/or related surgical and diagnostic fees, and the need for medical monitoring and invasive diagnostic procedures associated with the implantation of the product.

## COUNT II — NEGLIGENCE
### On Behalf of the Class

132. Plaintiffs and the Class incorporate by reference all preceding paragraphs.

133. Under all applicable state laws, Defendants had a duty to exercise reasonable care in updating the labeling of BIOCELL Breast Implants to reflect newly- acquired safety information without advance approval by the FDA. No state law imposes duties materially different from 21 C.F.R. § 814.39(d). Defendants failed to add information concerning the information Defendants knew or should have known concerning the increased risk of developing BIA-ALCL associated with their BIOCELL products and thus breached their duty to Plaintiffs and the Class.

134. Defendants' failure to provide adequate information and warning concerning the risk BIA-ALCL with the BIOCELL Implants and Tissue Expanders was a proximate cause of Plaintiffs' and the Class Members; increased risk of BIA-ALCL. But for Defendants' failure, Plaintiffs and the Class would not be at an increased risk of BIA-ALCL.

135. Had Defendants complied with their obligation to study, monitor, accurately and timely report the known information about the increased risk of developing BIA-ALCL,

the latency period of developing BIA-ALCL after implantations, symptoms of BIA-ALCL, and the proper diagnosis of BIA-ALCL, Plaintiffs treating physicians, would have communicated the information to Plaintiffs and members of the class.

136. In violation of 21 C.F.R. § 820.70(e), Defendants failed to establish and maintain production procedures to prevent contamination of their product by biofilm substances that could reasonably be anticipated to have an adverse effect on product quality.

137. Upon information and belief, when the BIOCELL Breast Implants placed into Plaintiffs and Class Members were manufactured, Defendants had the technological capability to manufacture its Breast Implants in a reasonably safe manner that would not put the Plaintiff or the Class at an increased risk of BIA-ALCL.

138. Under all applicable state laws, Defendants had a duty to exercise reasonable care in the design of BIOCELL Breast Implants to ensure as the use of the product would not cause serious adverse health consequences or death. The law does not impose duties materially different from 21C.F.R. § 820.30.

139. The Defendants' BIOCELL manufacturing processes was specifically designed to increase the complexity of the surface texture and increased tissue adherence. This manufacturing process made Plaintiffs and the Class susceptible or predisposed to BIA-ALCL or hypersensitivity-type adaptive immune responses because of the increased surface texture in the implant debris.

140. Defendants knew or should have known that increasing the complexity of the surface texture can markedly alter the pathophysiology of the foreign body response. Defendants knowledge could have been obtained from a variety of sources including: (1) their own clinical studies; (2) published studies and literature concerning the safety and efficacy of their BIOCELL Products; and (3) FDA and foreign regulatory communications.

141. Defendants' failure to exercise reasonable care in the labeling, production, and design of the BIOCELL Implants implanted into Plaintiffs and the Class, was a proximate

cause of damage to Plaintiffs and the Class including surgical costs of removal of the products and/or the surgical and diagnostic fees and medical monitoring and invasive diagnostic procedures associated with retention of product.

## COUNT III – FRAUDULENT CONCEALMENT
### On Behalf of the Class

142. Plaintiffs and the Class incorporate by reference all preceding paragraphs.

143. Prior to Plaintiffs and the Class members' use of the BIOCELL breast implants, and during the period in which Plaintiffs and Members of the Class actually used the breast implants, Defendants fraudulently suppressed material information regarding the safety and efficacy of the BIOCELL breast implants and the availability of alternative feasible safer designs.

144. The actual risk of ALCL or BIA-ALCL was not disclosed or discussed in the Products' consumer labeling, despite the availability of substantial evidence that an association existed and was established by at least 2008, but probably much earlier, as detailed in ¶¶ 86-105 above.

145. Defendants intentionally concealed safety issues with the BIOCELL breast implants in order to induce consumers, including Plaintiffs and the Class to purchase the BIOCELL breast implants, and to induce healthcare providers to use BIOCELL breast implants.

146. At the time Defendants concealed the fact that Defendants' BIOCELL breast implants were not safe as designed and marketed, Defendants were under a duty to communicate this information to the general public in such a manner that the general public could appreciate the risks associated with BIOCELL breast implants.

147. As a direct and proximate result of Defendants' malicious and intentional concealment of material and information, Defendants caused Plaintiffs' injuries.

148. Defendants furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

149. Defendants' acts before, during and/or after the act causing Plaintiffs' injuries prevented Plaintiff from discovering the injury or cause thereof.

150. Defendants' conduct, as described in the preceding paragraphs and in the Complaint, amounts to conduct purposely committed, which Defendants must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs and the public.

151. As a direct and proximate result of Defendants' fraudulent concealment concerning Defendants' BIOCELL breast implants, Plaintiffs and the Class have suffered damages in the form of surgical costs of removal of the products and/or the surgical and diagnostic fees and medical monitoring and invasive diagnostic procedures associated with retention of product.

## COUNT IV — UNJUST ENRICHMENT
### On Behalf of the Class

152. Plaintiffs and the Class incorporate by reference all preceding paragraphs.

153. Plaintiffs and the Class conferred a tangible and material economic benefit upon Defendants by purchasing recalled BIOCELL products.

154. Plaintiffs and Class members would not have purchased, chosen and/or paid for all or part of BIOCELL had they known that they would be exposed to the risk of developing BIA-ALCL.

155. Defendants refuse to compensate Plaintiffs and Class Members for the surgical costs of removal of the products and/or compensate them sufficiently for the surgical and diagnostic fees and medical monitoring and invasive diagnostic procedures associated with retention of the products.

156. Under these circumstances, it would be unjust and inequitable for Defendants to retain the economic benefits they received at the expense of Plaintiffs and the Class.

157. Failing to require Defendants to provide remuneration under these circumstances would result in Defendants being unjustly enriched at the expense of Plaintiffs and the

Class, who endure being exposed to an elevated risk of developing a serious and deadly disease.

158. Defendants' retention of the benefit conferred upon them by Plaintiffs and the Class would be unjust and inequitable.

159. Plaintiffs and the Class are entitled to restitution and disgorgement in an amount to be determined by the Court or a jury, as the law or equity allows.

## COUNT V — MEDICAL MONITORING

### On behalf of the California, New York, and Illinois Subclasses

160. Plaintiffs J.V., J.E., M.G., and A.L. and the California, New York, and Illinois Sub-Classes incorporate by reference all preceding paragraphs.

161. Due to the Defendants' actions and inactions, medical monitoring is, to a reasonable degree of medical certainty, necessary in order to diagnose BIA-ALCL.

162. While the exact risk of BIA-ALCL with BIOCELL textured implants, unknown, the available data suggests the approximate risk is six times greater from other manufacturers marketing textured implants in the United States and, in any event, implantation of Defendants' devices has placed Plaintiffs and the Subclass members at an elevated risk for BIA-ALCL compared to the general population and compared to the risk to which they otherwise would have been exposed. This cancer is serious and can lead to death, especially if not treated promptly.

163. Plaintiffs and members of the Class who have or have had the recalled BIOCELL product in their body, may not develop symptoms of BIA-ALCL for 27 years after implantation. The Defendants' BIOCELL Replacement program is inadequate in numerous ways, but relevant here is that it provides reimbursement only up to $1,000 in diagnostic fees and only until July 24, 2021.

164. Evaluation for BIA-ALCL involves a physical exam, imaging, and/or assessment of the fluid or tissue around the breast implant. The FDA recommends diagnostic evaluation including cytological evaluation of seroma fluid or mass with Wright Giemsa stained smears and cell block immunohistochemistry/flow cytometry

testing for cluster of differentiation (CD30) and Anaplastic Lymphoma Kinase (ALK) markers. Plaintiffs' and the Class Members' need for such care is required only because of Defendants' misconduct as described herein.

165. Medical monitoring, paid by Defendants, will ensure the Plaintiffs and the Class will be tested properly, whether before or after they develop symptoms of BIA-ALCL past the warranty expiration.

166. Plaintiffs and the Class therefore are entitled to have Defendants pay for the cost of ongoing medical monitoring.

167. Plaintiffs reserve the right to add Class Representatives from each state that allows medical monitoring if the Court it deems necessary and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request individually and on behalf of the Class, that this Court:

A. certify a class pursuant to Fed. Civ. P. 23(a), (b)(2), (b)(3) and/or (c)(4);

B. appoint Plaintiffs as representatives of the Class and respective subclasses;

C. appoint the undersigned as counsel for the Class and Subclasses;

D. award all actual, general, special, incidental, punitive, and consequential damages to which Plaintiffs and Class are entitled;

E. award equitable relief, including but not limited to, requiring Defendants to institute a medical monitoring program for Subclass members as pled herein;

F. award reasonable attorney's fees and costs; and

G. grant such further and other relief that this Court deems appropriate in law or in equity.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated: October 8, 2019      Respectfully submitted,

By: _/s/ Abbas Kazerounian_

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Nicholas R. Barthel, Esq. (SBN: 319105)
nicholas@kazlg.com
245 Fischer Avenue, Ste. D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A**.
Virginia Buchanan, Esq. (*PHV To Be Filed*)
vbuchanan@levinlaw.com
Matthew Schultz, Esq. (*PHV To Be Filed*)
mschultz@levinlaw.com
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7013
Facsimile: (850) 436-6013

**MEGAN MCBRIDE, ESQ. P.L.L.C**
Megan McBride, Esq. (*PHV To Be Filed*)
mmcbride@mcbrideesq.com
101 Palafox Place
Pensacola, Florida 32502
Telephone: (850) 450-1837

*Attorneys for Plaintiffs*